WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
Stu Dvoret,                    )
                               )
              Plaintiff,       )
                               )
         v.                    )    CIV 03-2133 PHX VAM
                               )
Maricopa County Community      )
Colleges,                      )    ORDER
                               )
              Defendant.       )
```

Pending before the Court is defendant's Motion for Summary Judgment. (Docs. 49, 50, 51 and 60).

**I. Summary Judgment Standard**

Summary judgment is appropriate when the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of demonstrating that there is no material fact precluding summary judgment. Adickes v. S.H. Kress and Company, 398 U.S. 144, 157 (1970).

Substantive law determines which facts are material. Anderson, 477 U.S. at 248; Jessinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex Corporation v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corporation v. Roven, 26 F.3d 960, 964 (9th Cir. 1994).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.; Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 585-88 (1986); Brinson v. Lind Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party. If the evidence is merely colorable or if not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50. However, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." Id. at 255.

2

**II. Relevant Undisputed Facts** ("**UF**")

**1.** The nursing program at MCC consists of four blocks, which are equivalent to semesters. At the time of plaintiff's search and suspension (October 31, 2002), plaintiff was a block four student. (Doc. 1 at p. 7 (para. 26)).

**2.** On October 31, 2002, plaintiff went to the MCC library to take the Health Education, Systems, Inc. ("HESI") test. (Doc. 1 at p. 8 (para. 28)).

**3.** The HESI test is administered to Block 4 (final semester) nursing students and is indicative of how they will perform on the nursing boards. (Doc. 50, Exhibit 3 at p. 74).

**4.** Prior to taking the HESI exam, plaintiff was on the brink of failing the nursing program. He had a total score of 75.66 but needed a score of 76 to pass and had already failed the program before he took the HESI test. (Doc. 50, Exhibit 3 at p. 29; Exhibit 1 at p. 103; Exhibit 4).

**5.** A passing grade on the HESI test could have elevated plaintiff's overall grade in the nursing program to a passing grade. (Doc. 50, Exhibit 3 at p. 30).

**6.** Plaintiff often dressed in "biker" attire. (Doc. 1 at p. 2 (para. 9)).

**7.** On October 28, 2002, three days prior to the HESI test, a disgruntled failing nursing student at the University of Arizona murdered three members of the University's nursing faculty on campus. (Doc. 50 at Exhibit 2).

**8.** Following the murders of the University of Arizona nursing faculty members, plaintiff made statements indicating an

3

understanding and/or sympathy for the actions of the murderer. (Doc. 50, Exhibit 1 at pp. 123, 125; Exhibit 6 at pp. 22; Exhibit 3 at pp. 54-55).

**9.** Plaintiff acknowledged making a statement indicating he understood why the killer in Tucson did what he did. Specifically, he admitted telling other MCC nursing students, that "if [the Tucson killer's] instructors screwed with him half as much as ours have with me, I can understand why he did something, ..." (Doc. 50, Exhibit 1 at p. 125).

**10.** MCC student Bridget Allen also reported to Nursing Department Chair Myrna Eschelman, that she heard plaintiff made statements to the effect that plaintiff had a "list of three" instructors like the killer down in Tucson. (Doc. 50, Exhibit 6 at p. 22).

**11.** Bridget Allen reported plaintiff's statements to other students. (Doc. 50, Exhibit 6 at p. 24).

**12.** Bridget Allen was contacted by Myrna Eschelman to verify the statements she heard plaintiff make and Allen confirmed to Eschelman that plaintiff made such a statement. (Doc. 50, Exhibit 6 at pp. 27-28).

**13.** On October 30, 2002, Myrna Eschelman sent an e-mail to MCC Security Director Steve Corich raising concerns about plaintiff because he was on the verge of failing and made statements sympathetic to the Tucson killer. She also stated that "[o]ther students have expressed concerns to their clinical instructor about this student if he fails." (Doc. 50 at Exhibit 9).

4

**14.** On October 30, 2002, by e-mail Eschelman indicated to Corich she had already alerted security and they would be present in the area of the HESI test.  (Doc. 50 at Exhibit 9).

**15.** In response to Myrna Eschelman's concerns in the e-mail of October 30, 2002, MCC Director Corich made arrangements to have "extra coverage" at the HESI test cite for October 31, 2002. (Doc. 50, Exhibit 7 at pp. 17-18).

**16.** On October 31, 2002, plaintiff arrived to take the HESI test at the MCC library.  (Doc. 50, Exhibit 1 at pp. 115-17).

**17.** Plaintiff, and others near him, were each asked by security officials, in particular MCC Security Director Steve Corich, to submit to a search.  (Doc. 50, Exhibit 1 at pp. 116-17).

**18.** Security officials informed plaintiff the search was voluntary and they didn't have to comply with the request.  (Doc. 50, Exhibit 1 at p. 117).

**19.** Plaintiff voiced no objection to the search, placed his bag on a table to be searched and opened his vest to permit security officials to see what was inside his jacket.  (Doc. 50, Exhibit 1 at p. 118).

**20.** When plaintiff opened his jacket, a security official noticed he had a knife clip.  Plaintiff was then "patted-down" and a collapsible baton was also discovered in plaintiff's back pocket.

**21.** The knife and collapsible baton were confiscated by security officials and plaintiff was permitted to enter the library to take the test.  (Doc. 50, Exhibit 1 at pp. 118-19; Doc.

5

57, Exhibit 1 at p. 22).

**22.** Eschelman sent an e-mail to Corich stating that after plaintiff sat down to take the test, Myrna Eschelman heard plaintiff say "they searched my bags. I think they thought I was going to do the Tucson thing, even though there are people here that deserve it."  (Doc. 50, Exhibit 3 at pp. 54-55)

**23.** Plaintiff took the HESI exam but did not pass.  (Doc. 50, Exhibit 1 at p. 107).

**24.** Plaintiff was informed before leaving the test site that he had not passed the test.  (Doc. 50, Exhibit 1 at pp. 104-07).

**25.** Shortly after the HESI test ended, and after receiving another e-mail from Eschelman reporting plaintiff's statement made at the test site, Director Corich e-mailed Dean Johnson and attached the second e-mail from Myrna Eschelman.  Corich recommended that plaintiff be suspended from campus for security reasons.  (Doc. 50, Exhibit 11 at p. 00019).

**26.** On October 31, 2002, the same day as the test, Dean Johnson, based on Corich's recommendation, sent plaintiff a letter notifying him he was barred from the MCC campus for one year effective immediately.  The suspension cited, among other provisions, plaintiff's possession of illegal or unauthorized weapons.  (Doc. 50, Exhibit 11 at pp. 1 and 00016).

**27.** The next day, November 1, 2002, plaintiff met with MCC Security Director Corich.  (Doc. 50, Exhibit 1 at p. 134; Exhibit 7 at p. 24; Exhibit 8 at p. 00021).

**28.** At the meeting with Corich, plaintiff explained the circumstances of the statements he made regarding the Tucson

6

1  incident.  (Doc. 50, Exhibit 1 at p. 134; Exhibit 8 at pp. 00021-
2  00022).

3  **29.** After the meeting, Corich sent an e-mail to Dean Johnson
4  saying he did not believe plaintiff posed a danger to students or
5  faculty and did not have any "anger control issues."  (Doc. 50,
6  Exhibit 8 at pp. 00021-00022).

7  **30.** Sometime within the next three weeks, plaintiff met with
8  Dean Johnson personally.  (Doc. 50, Exhibit 1 at p. 108; Exhibit
9  11).

10  **31.** On December 5, 2002, as a result of the meeting with
11  plaintiff and in light of Security Director Corich's e-mail of
12  November 1, 2002, Dean Johnson lifted plaintiff's suspension,
13  effective January 1, 2003.  (Doc. 50 at Exhibit 13).

14  **32.**  Plaintiff never applied for re-admission to the Nursing
15  Program nor did he contact MCC officials to see if he could re-
16  take the HESI exam.  (Doc. 50, Exhibit 1 at pp. 37-38).

17  **33.** At no time did anyone at MCC (faculty or administrators)
18  criticize, reprimand or make derogatory comments to him for
19  wearing "biker" attire.  (Doc. 50, Exhibit 1 at pp. 69-70, 74).

20  **34.** At no time did anyone at MCC (faculty or administrators)
21  criticize, reprimand or make derogatory comments about plaintiff's
22  "biker" associations.  (Doc. 50, Exhibit 1 at pp. 69-70, 74).

23  **35.** Plaintiff filed a Notice of Claim against MCC on
24  April 14, 2003.  (Doc. 50, Exhibit 16 at p. 1).

25  **36.**   The notice of claim cites A.R.S. § 12-821.01 and makes
26  claims alleging MCC violated his "civil and due process rights"
27  and "his First Amendment right to free speech under the Fourteenth

7

1  Amendment ..."  (Doc. 50, Exhibit 16 at p. 1).

2  **37.** The notice alleges the cause of action accrued on
3  October 31, 2002, "when MCC wrongfully suspended [plaintiff] from
4  the [MCC] campus ..."  (Doc. 50, Exhibit 16 at p. 1).

5  **III. Plaintiff's Complaint**

6  The only claims raised in the pro se complaint[1] allege,
7  first, that plaintiff was wrongfully searched prior to taking the
8  Health Education Systems, Inc. ("HESI") test on October 31, 2002,
9  and wrongfully suspended from being a nursing student at Maricopa
10 Community College ("MCC") in violation of his federal
11 constitutional rights.  Specifically, plaintiff alleges he was
12 suspended from MCC in violation of the rules governing suspensions
13 contained in the Student Handbook in violation of his right to due
14 process guaranteed by the Fourteenth Amendment.  (Doc. 1 at p. 15
15 (para. 60)).

16 The second federal claim raised in the complaint alleges
17 plaintiff was discriminated against by MCC officials based on his
18 dress, appearance and lifestyle as a "motorcycle enthusiast" in
19 violation of his First Amendment rights to free expression and
20 free association.  Specifically, plaintiff alleges Dean Johnson's
21 decision to suspend him from campus was based on his appearance
22 and his "biker" associations.  (Doc. 1 at p. 15 (para. 61); Doc.
23 56 at pp. 7-8).  Plaintiff also alleges his First Amendment rights
24 to freedom of expression and association were violated when "MCC

---

26  [1]Plaintiff is now represented by counsel.  (Doc. 8).  However,
the pro se complaint is still operative and no amended complaint,
27 or leave to file an amended complaint, has been sought.

28                                    8

1    faculty conspired to stage a pretextual 'search' of [him] before
2    the test took place, for the purpose of interfering with his
3    ability to complete the test and to ultimately remove him from the
4    Nursing Program."  (Doc. 1 at p. 9 (para. 34); see also Doc. 56 at
5    p. 8).  Plaintiff further asserts that "[a]lthough the reason for
6    staging the 'search' was ostensibly because [plaintiff] had
7    allegedly made a vague and unsubstantiated threat in the wake of
8    the homicides at the University of Arizona, electronic
9    communications between MCC personnel the day before the test make
10   clear that [plaintiff] was actually being targeted for his
11   beliefs, his sex, his age, his veteran status and his appearance."
12   (Id.).  Plaintiff identified MCC Security Director Steve Corich as
13   the "final policymaker" with respect to the search in his response
14   to summary judgment and at oral argument.  (Doc. 56 at p. 8).

15       Finally, plaintiff raises a pendant state law claim arguing
16   his suspension from MCC did not comply with the procedures
17   outlined in the MCC Student Handbook, and, thus, breached a
18   contract with him.  (Doc. 1 at pp. 15-16 (paras. 64-67)).[2]

19       **IV. Defendant's Motion for Summary Judgment**
20       **A. Plaintiff's § 1983 Claims**

21       Defendant contends, as a threshold matter, it is entitled to
22   summary judgment because petitioner has not established that any
23   of the officials responsible for violating his federal
24   constitutional rights were "final policymakers."  (See Doc. 49 at

---

[2] Pursuant to concessions made by plaintiff at oral argument on the summary judgment motion, plaintiff's claims concerning denial of equal protection in failing to round up his grades, as well as his state law claim alleging defamation were dismissed.

p. 11).

In <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658, 694 (1978), the U.S. Supreme Court held "a local government [entity] may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible ..." Thus, "a municipality [or government entity] cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." <u>Monell</u>, 436 U.S. at 490 (emphasis in original).

Subsequently, the Ninth Circuit held that "[a] school district's liability under <u>Monell</u> may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was a 'final policymaker.'" <u>Lytle v. Carl</u>, 382 F.3d 978, 982 (9th Cir. 2004). Plaintiff does not contend that either of the first two categories in <u>Lytle</u> apply. Instead, he asserts that both Corich and Johnson were "final policymakers" responsible for the search and suspension, respectively.

The <u>Lytle</u> Court stated that "[w]hen determining whether an individual has final policymaking authority, we ask whether he or she has authority *'in a particular area, or on a particular*

10

*issue.'"* Lytle, 382 F.3d at 983 (emphasis in original).  The court went on to note a key inquiry in determining if a school district superintendent was a "final policymaker" in regard to transfers of subordinate employees is "whether the superintendent 'possessed final policymaking authority in the area of employee transfers.'"  See also Christie v. Iopa, 176 F.3d 1231, 1236-37 (9th Cir. 1999) (to determine whether an official is a final policymaker, "courts consider whether the official's discretionary decisions are 'constrained by policies not of that official's making' and whether the official's decisions are 'subject to review by the municipality's authorized policymakers.'").  The question of whether an official is a final policymaker is a question for the court to decide based on state law.  Id. at 1235.

Regarding Student and Community Services Dean Johnson (whom plaintiff contends was a "final policymaker" for defendant MCC in regard to the decision to suspend him from the MCC campus), the undisputed facts and law show he is not a "final policymaker" as defined in Lytle.  The Student Handbook for MCC provides that the Governing Board of MCC has the ultimate authority to suspend, delete, restrict, supplement or change all "[p]olicies, courses, programs, fees and requirements" for MCC.  (See Doc. 50, Exhibit 14 (Student Handbook at p. 135).  Section 2.5.2, Article IV, Subsection C of The Student Handbook provides that in some instances (such as safety) "... appropriate college/center officials may impose an interim suspension prior to the hearing before a judicial body."  (Id. at p. 162).  The very next subsection of the Handbook discusses appeals from suspensions.

11

(Id. at p. 162).

In fact, an examination of the entire Section 2.5.2, Article IV of the Student Handbook (outlining "Judicial Policies"), reveals plaintiff has recourse to a formal process of notice and a hearing after imposition of any interim suspension before taking an appeal under subsection D. This process, outlined in subsection A of Article IV, lays out an elaborate procedure requiring timely notice followed by a timely hearing before a "judicial body" and a decision in writing from that body. (See Doc. 65, Attached Exhibit (Student Handbook at pp. 160-61)). Subsection B of Article IV outlines a list of potential "sanctions" which may be imposed by the "judicial body" if it determines a student has violated the Student Code. (See id. at p. 161)). Subsection D then outlines a procedure to appeal any determination of the judicial body under subsection A. (Doc. 50, Exhibit 14 (Student Handbook at p. 162)).

In light of the "judicial" procedures contained in subsections A, B and D of Article IV, any decision by Dean Johnson to impose an interim suspension is followed by two levels of process, namely, a formal hearing procedure before a "judicial body," followed by an avenue to appeal any decision by that body to an "appeal board." Because plaintiff had the right to a two-tiered process for review of Dean Johnson's decision to suspend him, Johnson is not a "final policymaker" as defined by Monell and Lytle and plaintiff's § 1983 claims against defendant MCC fails as a matter of law. See Lytle, 382 F.3d at 983.

In addition to the fact that Dean Johnson's actions may not

12

be ascribed to defendant MCC as a matter of law, plaintiff's claims predicated on Dean Johnson's action in suspending plaintiff from the MCC campus on October 31, 2002, whether couched as a denial of due process or a denial of his rights under the first amendment to freedom of expression or association, fail on the merits. Review of the record shows that plaintiff was afforded all process due him under the law. Although plaintiff was suspended prior to holding a hearing, case law on this question has endorsed pre-hearing suspensions for "[s]tudents whose presence poses a continuing danger to person or property or an ongoing threat of disrupting the academic process ..." Goss v. Lopez, 419 U.S. 565, 581 (1975). When this is done, "the necessary notice and rudimentary hearing should follow as soon as practicable." Id. This is consistent with the Student Handbook. (Doc. 50 at Exhibit 14).

In this case, the letter sent by Dean Johnson on October 31, 2002, notifying plaintiff of his suspension from campus cited security concerns, namely, the fact that plaintiff came to the HESI test carrying weapons. (UF 26). This fact, and the further undisputed fact that plaintiff made remarks which could reasonably have been construed as sympathetic to the killer who murdered nursing faculty at the University of Arizona just three days before, were sufficient, as a matter of law to establish the kind of security threat which permitted Dean Johnson to suspend plaintiff prior to holding a hearing.

Furthermore, in compliance with the criteria outlined in Goss, it is not in dispute that plaintiff was permitted to make

his case to MCC Security Director Corich the next day, and Corich's recommendation, together with the meeting held three weeks later between plaintiff and Dean Johnson, resulted in the lifting of plaintiff's suspension from campus. (UF 27-31). In short, the process worked, and the fact it occurred after plaintiff's suspension was not contrary to law. As a result, under the undisputed facts plaintiff's claim fails as a matter of law.

Similarly, plaintiff has failed to present any evidence that Dean Johnson's decision to suspend him was based on his "biker" appearance or associations. On the contrary, undisputed evidence shows that Johnson's decision was based on security concerns. It is undisputed that in light of plaintiff's statements and the fact that he was found in possession of a knife and a collapsible baton when he attempted to enter to take the HESI test that MCC Security Director Corich recommended that Dean Johnson "not tread lightly" in this matter. (UF 25, Doc. 50, Exhibit 11 at p. 00019). In addition, Dean Johnson received additional information attached to Corich's e-mail, including Myrna Eschelman's e-mail, indicating plaintiff made statements sympathetic to the Tucson killer and that plaintiff had been searched and found in possession of a knife and a collapsible baton. (UF 25, Doc. 50, Exhibit 11 at pp. 1 and 00016).

Conversely, plaintiff has produced no evidence to support his allegation that Dean Johnson's decision to suspend him was based on his "biker" appearance or associations. (See Doc. 1 at p. 15 (para. 61); see also Doc. 56 at pp. 3-4, 6-7). Although, in one

14

e-mail sent by Eschelman to Corich, Eschelman mentions plaintiff's biker dress and associations, (see Doc. 50 at Exhibit 4), there is no evidence that Dean Johnson was made aware of this prior to his decision to suspend plaintiff.  On the contrary, the e-mails attached by Security Chief Corich to his recommendation that Johnson "not tread lightly" made no mention of plaintiff's appearance or associations, the only matters of concern presented in these documents relate to security and it was solely on this basis that Dean Johnson decided to suspend plaintiff.  (See Doc. 50, Exhibits 11 and 12 and Doc. 51).  Plaintiff has produced no evidence to support his assertion that Dean Johnson's decision to suspend him, pre-hearing, was motivated by plaintiff's "biker" appearance and/or associations.  Summary judgment on plaintiff's First and Fourteenth Amendment claims pertaining to the actions of Dean Johnson in suspending plaintiff prior to a hearing is appropriate.

With respect to the search conducted prior to taking the HESI test, plaintiff asserts that MCC Security Director Steve Corich was the "final policymaker."  In his deposition, plaintiff asserts that Corich was the one who requested he submit to a search when he entered the library to take the test.  (Doc. 50, Exhibit 1 at p. 116).  Other than this statement in his deposition, plaintiff has identified no evidence to support his claim that Corich was the "final policymaker" with respect to the search as defined by Monell and Lytle.  In fact, review of other evidence shows that security was present that day due to requests made by Nursing Department Chair Myrna Eschelman.  (UF 15; Doc. 57, Exhibit 1 at

15

p. 15).

Plaintiff has identified no provision in the Student Handbook or any other document associated with MCC, which designates Corich as having the power to initiate a search on behalf of MCC. The evidence indicates the increased security measures, including the search, were instigated by a request from Myrna Eschelman, Nursing Department Chair, to "security" and Corich. (UF 15; Doc. 50 at Exhibit 4; Doc. 57, Exhibit 1 at p. 15).

However, even assuming a question of fact remains on whether Corich was a final policymaker, this claim fails at a more basic level. In spite of plaintiff's assertion in his complaint and in his response to summary judgment, plaintiff has provided no evidence to support his assertion that the search was coerced and involuntary, let alone conducted as a "pretext" to interfere with his ability to successfully complete the HESI test. (See Doc. 1 at p. 9 (para. 34)). On the contrary, in his own deposition, plaintiff does not dispute that those who requested to search him told him the search was voluntary and that he "didn't have to comply with it." (UF 18; Doc. 50, Exhibit 1 at pp. 116-17). Plaintiff also acknowledged he heard Corich make the exact same request of other students. (UF 17, Doc. 50, Exhibit 1 at p. 116).

Plaintiff complains that unlike other students he was physically patted down. This is true, but it is undisputed that this did not happen until, on his own initiative, plaintiff opened his jacket and an officer spotted a knife concealed underneath. Only at that point was plaintiff physically searched. (UF 19, Doc. 50, Exhibit 1 at p. 118; Doc. 57, Exhibit 1 at pp. 21-22).

As a result, the initial search was voluntary and did not violate plaintiff's constitutional rights. Moreover, once a knife was discovered concealed under his jacket, the "pat-down" search which followed, resulting in discovery of a collapsible baton as well, was also reasonable. Plaintiff produced no evidence to support his allegation that the search was based on his "biker" dress or associations. On the contrary, defendant produced a plethora of evidence that the search was voluntary and based on security concerns. (See UF 7-15, 20). Plaintiff's claim his rights were violated when he was searched prior to entering the MCC library fails on the law and the undisputed facts.

**B. Plaintiff's Remaining State Law Claim (Breach of Contract)**

Plaintiff also alleges that "[t]he rules, regulations and policies promulgated by Defendant constitute a contract between Defendant and its students" and that "[b]y failing to abide by the terms and conditions of the [Student] Handbooks, and acting arbitrarily, capriciously and in bad faith, Defendant breached its contract with Plaintiff." (Doc. 1 at p. 15 (para. 65)). Plaintiff identified the "contract" as the Student Handbook.

Defendant contends this claim fails at many levels as a matter of law. First they assert that plaintiff's Notice of Claim is insufficient to permit him to raise this claim in the action. A.R.S. § 12-821.01(A) requires that any claim presented against a governmental entity provide "facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed." To satisfy this requirement, the notice of claim "must at least contain enough information to allow the state

17

to intelligently ascertain these purposes so it can conscientiously allow or disallow the claim." Howland v. State, 169 Ariz. 293, 299, 818 P.2d 1169, 1175 (Ariz.Ct.App. 1991). The penalty for failing to specify a claim is dismissal of the claim in any subsequent legal action. See Hollingsworth v. City of Phoenix, 164 Ariz. 462, 464, 793 P.2d 1129, 1131 (Ariz.Ct.App. 1990).

Defendant argues that nowhere in the Notice of Claim does plaintiff state MCC breached a contract with him. They contend that the terms "contract" and "breach" are not mentioned in the notice. The Court has reviewed the Notice of Claim. (Doc. Doc. 50 at Exhibit 16). Defendant's assertions are well-taken. Nothing in the notice can be read as indicating plaintiff is raising a breach of contract claim based on MCC's alleged failure to abide by its policies as enunciated in the Student Handbook. As such, the notice is deficient with respect to this claim and summary judgment is appropriate.

In addition, as also urged by defendant, plaintiff's claim that the Handbook constitutes a contract with him is without merit. Under Arizona law, for a contract to exist, "there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." Savoca Masonry Company Inc. v. Homes and Son Construction Company, Inc., 112 Ariz. 392, 394, 542 P.2d 817, 819 (Ariz. 1975). More particularly, with respect to provisions in a handbook, such as an employment handbook, it has been held that "not ... all ... terms create contractual promises." Demasse v.

ITT Corp., 194 Ariz. 500, 984 P.2d 1138, 1143 (Ariz. 1999). A statement is contractual only if it discloses "a promissory intent or [is] one that [a party] could reasonably conclude constituted a commitment by the [other party]. If the statement [in an employment handbook] is merely a description of the employer's present policies ... it is neither a promise nor a statement that could reasonably be relied upon as a commitment." Demasse, 194 Ariz. at 505, 984 P.2d at 1143. In addition, "[o]nce a ... contract is formed - whether the method of formation is unilateral, bilateral, express, or implied - a party may no longer unilaterally modify the terms of that relationship." Id. Modification of contracts may occur only under the following conditions: "(1) an offer to modify the contract; (2) assent to or acceptance of that offer, and (3) consideration." Demasse, 194 Ariz. at 506; 984 P.2d at 1144.

   Applying these principles of contract law, the MCC Student Handbook is not a contract. By its own terms, the Handbook permits MCC to modify its contents at will and without notice. (Doc. 50 at Exhibit 14 (Student Handbook: Section 2.1(A) at p. 135). Such power does not bespeak a desire to create, let alone present the elements of, a contract. Plaintiff cited no authority to support his contention that the MCC Student Handbook is an enforceable contract between MCC and plaintiff.

   Finally, even assuming the existence of a contract, plaintiff cannot show a breach. Pre-hearing "interim" suspensions are contemplated under Article IV, Subsection C of the Student Handbook for reasons of security. (Doc. 50, Exhibit 14 at p.

19

162). Under the undisputed facts (plaintiff's statements concerning the Tucson murders and the fact that weapons were found concealed on his person when he attempted to enter the MCC Library to take the HESI test), MCC officials had a basis to suspend plaintiff prior to granting him a hearing, either formal or informal. As noted, this is contemplated under the terms of the Handbook and plaintiff's pre-hearing suspension was not contrary to its provisions. Summary Judgment on this issue is warranted.

**IT IS THEREFORE ORDERED** that defendant MCC's Motion for Summary Judgment (Doc. 49) is granted.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment for defendant in this matter accordingly.

DATED this 5th day of June, 2006.

_____
Virginia A. Mathis
United States Magistrate Judge